## ATKINSON ET AL. v. TABOR ET AL.

1. Where a deed was deposited with a bank as an escrow, to be delivered upon payment of the balance of the purchase money, and payment was made in accordance with the escrow conditions, *held*, in this case, that the payment was an absolute and irrevocable payment under the contract between the parties.

2. Where, by stipulation, the evidence is taken by a notary public, and submitted to a referee, and the oath taken by the referee bears date only two days prior to the filing of his report, but objection to the taking of the oath is first raised on appeal, the objection is waived.

*Appeal from District Court of Lake County.*

A COMPREHENSIVE statement of the facts of this case, as well as the final conclusions of the referee, are shown by such portions of the referee's report, as follows:

"The essential substantive facts found from the evidence in this cause are as follows: On the 7th day of May, 1880, Nicholas N. Atkinson, James F. Chaney and S. E. Bruckman entered into an agreement in writing, by which Bruckman agreed to furnish to Atkinson and Chaney $15 per week, in return for which they were to prospect for mineral lodes or claims, and, upon discovery of such lodes, they were to locate and record the same according to law in the names of the three parties to said agreement, and that such agreement was to continue as long as Bruckman paid the $15 per week, up till December 1, 1880. It was also agreed that report should be made of the progress of such work to Bruckman at least once in ten days. On this contract Bruckman paid Atkinson and Chaney $75 prior to July 5, 1880. On the 16th day of June they located the Montezuma and Borealis lodes, and on the 22d the Elkhorn lode. The three lodes last mentioned were staked in the names of Chaney, Atkinson and Bruckman. Subsequently, and after July 5th, Chaney discovered a vein in the lower part of the Elkhorn claim, and located the Tam O'Shanter on this vein, taking in about one-half of the Elkhorn. The date of the discovery of the Tam O'Shanter was put upon the stake as that of June 22d, the date of the Elkhorn discovery; and the names of Bruckman, Chaney and Atkinson were put upon the Tam O'Shanter stake, and subsequently, after cancellation of agreement, Bruckman's name was cut off. On the 5th day of July Atkinson left his work of prospecting and went to Leadville, arriving on the 7th, carrying with him samples from the three mines located by them. On his arrival he found Bruckman unwilling to continue the agreement, and on

the 12th of July Bruckman and Atkinson indorsed on the agreement these words: 'We, the undersigned, parties to the within contract, agree to cancel the same.' This was signed by Bruckman and Atkinson, and signed by Atkinson for Chaney. On the 30th of June, 1881, William Parker and Jacob Sanders entered into an agreement in writing, in consideration of money paid and to be paid by Parker and Sanders, by which Atkinson and Chaney agreed to sell to Parker and Sanders the Montezuma, Borealis, Tam O'Shanter and other mines in Pitkin county, Colorado. By the terms of this agreement Parker and Sanders were to pay in cash $100 to build a trail to the lodes, and the further sum of $5,000 as a forfeiture if they failed to pay the balance, $95,000, within ninety days from the date of the agreement, the purchase price being fixed at $100,000. It was further agreed that the vendors should deposit a deed or deeds to said lodes in some bank in Leadville, and that such deeds should be delivered to Sanders and Parker on full payment of the $100,000, the $5,000 to be a part of such payment; and, further, that if the $5,000 was not paid on the proper execution and deposit of such deeds, or if the $100,000 was not paid in full within the time,—ninety days from the execution of the deeds,—then such contract was to be null and void. It was also agreed that vendees were to take possession of the lodes at once, and to work them as they saw fit, taking out and sacking the ore, which, in case of a failure on the part of the vendees to complete the purchase, was to remain the property of Atkinson and Chaney. At the time of making this agreement Chaney represented to the purchasers that the entire property belonged to himself and Atkinson, and that there was no controversy in relation thereto, and that they were the sole owners thereof. On the 5th day of July, 1881, said Parker assigned his interest in the contract to Sanders, and on the same day Sanders entered into an agreement in writing with H. A. W. Tabor, by

which Tabor undertook to furnish the $5,100 called for
by the contract, and sufficient money to work the lodes
until the expiration of the ninety days, or until aban-
doned; said Sanders to superintend the work and the
payments therefor.   It was further agreed that if, upon
development, the property should prove to be worth
$100,000, then Tabor was to pay for the same in full
within the said ninety days; Sanders to execute a deed
to Tabor, to be placed in the same bank with those of
Atkinson and Chaney, which deed, together with that to
Sanders, were to be delivered to Tabor on payment of the
amount due within the ninety days, and that, in case the
title thus passed to Tabor, he was to work the property,
making use of Sanders as superintentent, until such time
as he should have been reimbursed for the purchase
money, the expense of working the mine, and then deed
to said Sanders one-half the mine.   There were also other
agreements between Tabor and Sanders; but, as they re-
late to contingencies that did not happen, no reference
need be made to them.   Tabor paid the $5,100, and the
deeds were put in escrow.   On the 7th or 8th of July,
1881, Tabor took possession of some of these lodes, and
especially of the Tam O'Shanter lode, and commenced to
work the same; he and Joel W. Smith, who became in-
terested in the property about the 5th of July, expending
in such development, prior to October 3, 1881, about
$10,000.   On the 8th day of August, 1881, Samuel E.
Bruckman began an action in the district court of Pitkin
county, Colorado, against Chaney and Atkinson, setting
up the prospecting agreement of May 1, 1880, above
mentioned, and alleging that, under and in pursuance of
such agreement, the defendants discovered the Tam
O'Shanter, Montezuma, Borealis, Ivanhoe, Halcyon, Last
Chance, and Green Lake lodes, but omitted to record the
same in the name of the three, but recorded the same in
the name of the defendants only; the defendants had en-
tered into a contract to sell the entirety of such lodes, to

convey the same upon payment of the price agreed upon; and prayed judgment therein that plaintiff might be adjudged to be the owner of an equal undivided one-third of said claim, and that he might be declared to have a lien upon the interest of the defendants for one-third of the moneys received by them on account of such sale, and for other relief.    On the same day a notice of *lis pendens* was filed in the office of the recorder of deeds of Pitkin county, setting forth that a suit had been begun to establish the right of the plaintiff to one-third of the lodes therein mentioned, including the Tam O'Shanter, and to have a lien declared in his favor, upon the interests of Atkinson and Chaney, for certain moneys received by them in contract for sale of plaintiff's interest in said lodes.    This suit was begun, and *lis pendens* filed, without the knowledge of Tabor, Smith, Sanders or Parker, and so without collusion with Bruckman, neither of these parties knowing anything about the suit, or the nature of Bruckman's claim, until after suit was brought.

"Some time in the latter part of September, 1881, Atkinson had a conversation with Sanders about the Bruckman claim, and, a few days later, Tabor and Smith, and their attorneys, were shown the grub-stake contract with Bruckman, and the alleged cancellation indorsed thereon, and at this time Tabor and Smith suggested that Atkinson and Chaney might be willing to deduct something from the $100,000 in consideration of getting the money before the expiration of the ninety days.    No sum was mentioned by either party, and no agreement of any kind was made.    It is a disputed point, but it was fairly established by the evidence of one witness, and want of recollection by another, that Atkinson told Sanders, about this time, that one-third of the purchase money might be left in the bank, and they would fight the Bruckman claim.    There is, however, no evidence that this was ever communicated to either Smith or Tabor. On the 29th day of September, Smith and Tabor made a

contract with Bruckman, by which the latter agreed to release to the former all his right in and to the lodes mentioned in his complaint against Atkinson and Chaney on payment of $25,000, within thirty days, which agreement was carried out by the making and delivery of a deed to Tabor and Smith to the same property on the 28th day of October, 1881. On the 3d day of October, Smith and Tabor paid into the Bank of Leadville the sum of $95,000, and this sum was deposited to the credit of the several parties mentioned in the escrow agreement left with the deeds, to wit, $42,600 each to Chaney and Atkinson, and $4,900 each to J. D. Hooper and J. L. Hill; said several sums being also mentioned in the agreement of escrow. Before this amount was paid by Tabor and Smith, they had, under the advice of A. W. Bucker, Esq., and A. S. Weston, Esq., caused a complaint and other papers to be executed and filed in the district court of Lake county, and had procured an order for an injunction out of said court, directed to Chaney and Atkinson and the Bank of Leadville, restraining Chaney and Atkinson from demanding, suing for or receiving from the bank any money deposited by plaintiffs in said bank, or from demanding, suing for or receiving from the bank the deeds of Chaney and Atkinson to Parker and Sanders, or from suing for the cancellation of such deed, and also restraining the bank from paying over the money, or from delivering the deeds to Chaney and Atkinson. The complaint was filed, and the injunction issued, an hour or so before the money was paid to the bank; but the money was paid in, and the deposit to the said several parties was entered, before the injunction was served. Service was had on the case on the 3d of October, and defendants filed a general demurrer therein October 13, 1881. From this time down till January 31, 1882, no steps were taken by defendants to dissolve the injunction or push the case for trial in any way. Within forty-eight hours after the injunction was served defendants

were advised by their counsel that the facts in the case entitled ʋhem to elect either to take the money paid in or to refuse to receive it and recover the property. In the meantime Tabor and Smith, having received from the bank the deeds to the property, continued to work the same, and expended thereon, between October 3, 1881, and January 31, 1882, from $9,000 to $14,000. During this time the defendants on several occasions alleged they had not concluded whether they would go for the money or the property. The evidence shows defendants were poor men aside from their interest in these lodes, and the claim made is that they had no money to employ counsel to prosecute their claim until January 31, 1882, when they made arrangements with other parties to furnish means for that purpose. By this arrangement Atkinson and Chaney sold three-fourths of the lode property in dispute for the sum of $63,000, $20,000 cash in hand, and the balance as provided for; and that, in case the property should be held to belong to Tabor and Smith, then the vendees should be entitled to three-fourths of the money then in the bank. On the same day, January 31, 1882, the defendants Atkinson and Chaney filed therein a cross-bill, setting up the facts above stated, or a portion of them, asking that Bruckman, Parker and Sanders be made parties thereto, and asking, by way of relief, that the deed from Atkinson and Chaney to Sanders and Parker might be ordered to be delivered up and canceled, and that the complainants in the cross-bill might be decreed to be the owners of the lode property free and clear of all claim of plaintiffs, Tabor and Smith, or of Sanders, Bruckman or Parker, and that an account should be taken of the ore extracted by plaintiffs, and that they be decreed to pay to Atkinson and Chaney the value thereof, and that the possession of said property be delivered up, etc. To this cross-bill answer was made by Sanders, Smith and Tabor, which puts in issue all the material facts set up in the cross-bill, and alleges new

matter, to which replication was made by complainants in the cross-bill, and the said Bruckman disclaimed. The issues were thus joined May 6, 1882. On the 11th day of July, 1882, the plaintiffs, Smith and Tabor, entered an order in the cause dissolving the injunction therein, and served notice of such dissolution on the said Chaney, Atkinson and the Bank of Leadville. The defendants Chaney and Atkinson refused to take the money, and still claim the right to receive the property. It should be further stated that, after the injunction was granted, it was discovered that it did not cover the moneys deposited to the credit of Hooper and Hill, and that, some days after, Jacob F. Sanders took an assignment of the claims of these men, and the money was transferred to his account; he obtaining them at a slight discount."

After a lengthy discussion and presentation of the questions arising upon these facts, the referee concluded his report as follows:

"From these facts and considerations it follows, and, as a matter of law, is here found, that on the 3d day of October, 1881, the plaintiffs were, by virtue of the agreements made between Atkinson, Chaney and Parker, Sanders, and between Parker and Sanders and the plaintiffs, entitled to the deeds to the property mentioned in plaintiffs' complaint and defendants' cross-bill, and were at that date, in equity, the rightful owners of the same. Second, that, even if it is true that plaintiffs had no right, after injunction was granted, to take delivery of the deeds, yet equity will not compel a redelivery thereof, since, by dismissal of all proceedings, they are now entitled to such deeds. Third, that if defendants ever had the right to call on the plaintiffs to surrender possession, and retake the title, they lost such right by their laches in neglecting to elect whether they would abide by the sale and take the purchase money, or recover the property. Fourth, that no fraud is shown in the evidence, and, as it cannot be presumed, the defendants' cross-bill is insuf-

ficient in fact and in law; they cannot have the relief demanded in such cross-bill. *Fifth*, that the relief prayed for in such cross-bill should be denied, and such cross-bill, together with the original bill, be dismissed.

"WILLARD TELLER, Referee."

Exceptions to the report were filed by appellants, and the same were overruled; whereupon the court gave judgment according to the conclusion reached by the referee, to reverse which this appeal was taken.

Messrs. MARKHAM, PATTERSON and THOMAS, BELFORD and REED, and A. S. BLAKE, for appellants.

Messrs. L. C. ROCKWELL and A. W. RUCKER, for appellees.

STALLCUP, C.  Did the attempt of the appellees to detain in the hands of the bank the purchase money paid in the manner and for the purpose shown subject them to a cancellation of their deeds of conveyance, and a return of the property conveyed thereby? The appellants affirm the same, for the reasons, as they contend, that the said payment to the bank was not a *bona fide* payment, and that the said injunction order obtained was an "abuse of process." But, in view of the evidence, this position is untenable for these reasons: The payment of the purchase money to the bank was for the appellants, and to their credit, was an unconditional payment, and was made according to the escrow conditions. By such payment the bank was authorized to deliver the deeds, and, when the bank was so authorized to deliver, the appellees were authorized to receive the same. Notwithstanding the proceedings for the writ of injunction were concurrent with the performance of the escrow conditions, the money so paid by the appellees was thereby, and ever since has been, treated by appellees as the money of appellants. There was no abuse of process in the premises, for the reason that no advantage

was obtained by force of the writ itself; that is to say, the act complained of — the delivery of the deeds — was not procured thereby. The findings and the weight of the evidence are to the effect that the sole purpose of the writ was for indemnity for the deficit, and not for procuring the delivery of the deeds, and that the purchase money had been paid *bona fide* for delivery thereof.

The Bruckman claim was sufficient to cause apprehension, and a desire to avoid trouble and possible loss thereby. The acquisition thereof at an outlay of $25,000, the voluntary and unqualified dissolution of the injunction, and offer of dismissal of the cause by appellees thereupon, leaving themselves liable upon their bond for any injury caused thereby, together with the direct and uncontradicted evidence of the appellees, seem to be sufficient to warrant the findings of the referee of the *bona fides* of the payment of the purchase money, as well as the entire want of equity to sustain the cross-complaint. Our Code of Civil Procedure provided for the speedy hearing of motions to dissolve such injunctions in term time or in vacation, so that a speedy dissolution or modification of this injunction was at all times easily attainable if the same was wrongfully issued. Why this line of procedure was ignored by the appellants, and why they stood by and waited for nearly four months before electing to pursue the course they have pursued, are matters we need not consider, as they apply only to the question of laches; and, as we have seen, there never was any right to the relief demanded by appellants in their cross-complaint, that question is not necessarily in the case.

By stipulation duly made it was provided that the evidence should be taken by a notary public, and accordingly submitted to the referee. The hearing was accordingly had before the referee. It appears that the oath taken and subscribed to by the referee bears date only two days prior to the day upon which the report

was filed. The objection is here made that the oath should have been taken and filed by the referee prior thereto. This objection was waived by action of the parties in proceeding without question thereof. *Keator v. Plank-Road Co.* 7 How. Pr. 41. Besides, such incident would be insufficient to warrant a reversal here, for the reason that the judgment order of the court denying the relief demanded by appellants is sustained by the weight of the evidence, and therefore should be affirmed.

RISING and DE FRANCE, CC. We concur in the affirmance of the judgment, upon the sole ground that the deposit in the Bank of Leadville, to the credit of appellants, of the sum named in the contract of escrow, was an absolute and irrevocable payment of such money under the terms of the contract between the parties. This being so, a statement of facts covering more than this one proposition is unnecessary, and is liable to create an opinion that the unimportant facts, so stated, enter into and form the basis for the affirmance of said judgment.

PER CURIAM. For the reasons given in the foregoing opinion of Commissioner STALLCUP (excluding any such inference as is suggested in the majority opinion) the judgment is affirmed.

*Affirmed.*